IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DANIELLE KAMINSKI, | ) | CASE NO. 1:15-cv-01103 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Danielle Kaminski ("Plaintiff" or "Kaminski") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI").[1] Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

---

[1] Plaintiff also filed an application for Disability Insurance Benefits ("DIB") but she is not appealing the denial of her DIB claim. *See* Doc. 13, p. 1, n. 1 (indicating that Kaminski was last insured for benefits on June 30, 2006, and since she alleged a disability onset date of February 1, 2009, she is not appealing the denial of her DIB claim).

## I. Procedural History

Kaminski protectively filed her application for SSI on December 20, 2011.[2]  Tr. 10, 65, 66, 149-154.  She alleged a disability onset date of September 6, 2003,[3] (Tr. 10, 171), and alleged disability due to endometriosis, migraines, depression and anxiety (Tr. 57, 99, 115, 175).  After initial denial by the state agency (Tr. 99-105) and denial upon reconsideration (Tr. 115-119), Kaminski requested a hearing (Tr. 120).  A hearing was held before Administrative Law Judge Edmund Round ("ALJ") on January 13, 2014.  Tr. 25-48.

In his February 28, 2014, decision (Tr. 7-24), the ALJ determined that Kaminski had not been under a disability from September 6, 2003, through the date of the decision.  Tr. 10, 19.  Kaminski requested review of the ALJ's decision by the Appeals Council.  Tr. 6.  On April 9, 2015, the Appeals Council denied Kaminski's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.    Personal, educational, and vocational evidence

Kaminski was born in 1984.  Tr. 18, 31, 149, 155.  She was 29 years old at the time of the administrative hearing and was living with her mother and her 2 year old daughter.  Tr. 31, 40.  She attended high school through 12th grade but did not graduate and did not obtain a GED.  Tr. 31.  Kaminski last worked in 2009 as a nanny.  Tr. 32.

---

[2] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application." http://www.socialsecurity.gov/agency/glossary/ (last visited 5/2/2016).

[3] The ALJ's decision reflects an alleged onset date of September 6, 2003.  Tr. 10.  This date is supported by the record.  Tr. 57, 171.  In her Brief, Plaintiff indicates that she alleged an onset date of February 1, 2009.  Doc. 13, p. 1.  This date is also supported by the record.  Tr. 149, 175.

B.	Medical evidence

On December 27, 2011, Kaminski saw Lisa H. Kurtz, M.D., of Northern Neurology, Inc., as a new patient.  Tr. 233-235.  Kaminski reported horrible migraines.  Tr. 233.  Her daughter was 2 months old.  Tr. 233.  Kaminski indicated that her migraines were a million times worse while she was pregnant.  Tr. 233.  Her headaches lasted a few days and she would be sick in bed with headaches.  Tr. 233.  Dr. Kurtz started Kaminski on Topamax.  Tr. 235.

On February 28, 2012, Kaminski was seen at Southwest General Health Center, with complaints of migraines once per day and abdominal pain twice per day.  Tr. 247-251.  Kaminski was discharged the same day and prescribed pain medication.  Tr. 251.  Kaminski was seen again at Southwest General on April 18, 2012, with complaints of headaches/migraines.  Tr. 252-256.  On discharge, Kaminski's condition had improved.  Tr. 254.  She was discharged that same day with medication and instructions to follow-up with her physician.  Tr. 256.

On April 30, 2012, Dr. Kurtz completed a questionnaire regarding Kaminski's medical conditions.  Tr. 229-230.  Dr. Kurtz reported seeing Kaminski only once, on December 27, 2011. Tr. 229.  Dr. Kurtz's diagnoses were migraine headaches, upper back/neck pain, paresthesias, scoliosis, anxiety and depression.  Tr. 229.   In describing the symptoms associated with Kaminski's condition, Dr. Kurtz reported that Kaminski started having migraine headaches at age 10 with her headaches being worse while she was pregnant.  Tr. 229.  Dr. Kurtz indicated that there were no focal findings on neurological examination.  Tr. 229.  She also indicated that there was no consultative/diagnostic testing available.  Tr. 229.  Dr. Kurtz indicated that, on December 27, 2011, she had recommended that Kaminski have a brain MRI and cervical spine MRI but Kaminski had not done the testing and did not follow up as recommended.  Tr. 229.

Kaminski had been given Zomig samples but called Dr. Kurtz and reported that it was not helpful. Tr. 230. Amerge and Ultram, along with Topamax, were then prescribed. Tr. 230. Dr. Kurtz reported that she was unable to comment on Kaminski's response to Topamax, Amerge, and Ultram because Kaminski had not followed up. Tr. 230.

On August 25, 2012, Charles F. Misja, Ph.D., saw Kaminski and completed a psychological evaluation. Tr. 271-276. Kaminski reported having migraines about twice a week and relayed that she is bedridden during those times. Tr. 275. Dr. Misja diagnosed adjustment disorder with depressed mood and indicated that Kaminski had reported pain associated with endometriosis and migraine headaches. Tr. 274. Dr. Misja assessed Kaminski's functional abilities. Tr. 275-276. He opined that Kaminski should be able to understand and implement ordinary instructions; she had mild limitations in maintaining attention and concentration and in maintaining persistence and pace to perform simple and multi-step tasks; she had mild limitations in responding appropriately to supervision and coworkers in a work setting; and, except for Kaminski's reported problems with maintaining a job because of her health problems, she should be able to function adequately and she would have mild limitations in her ability to respond appropriately to work pressures in a work setting. Tr. 276.

In October 2012, state agency reviewing physician Steve E. McKee, M.D., completed a physical RFC assessment. Tr. 85-87. Dr. McKee opined that Kaminski could lift and/or carry 50 pounds occasionally and 25 pounds frequently; could stand and/.or walk for 6 hours in an 8-hour workday; could sit for 6 hours in an 8-hour workday; except as shown for lift/carry, could push/pull unlimitedly,; could frequently climb ladders, ropes, and scaffolds; and could climb ramps and stairs, balance, stoop, kneel, crouch, and crawl unlimitedly. Tr. 86.

On March 26, 2013, Kaminski saw Stephanie Towers, PA, with the Ridgepark Family Practice, Inc., to establish care.  Tr. 285.  She complained of intermittent bilateral hip pain at night during the prior month.  Tr. 285.  She also complained of a history of migraines since she was a teenager.  Tr. 285.  Kaminski reported having at least one migraine a week with such severity that they can last up to three days and force her to stay in bed.  Tr. 285.  She reported knowing that too much or too little caffeine could trigger a migraine.  Tr. 285.  She also reported that she was supposed to have had imaging studies performed and she had tried Zomig, Topamax, Maxalt, and Imitrex with no relief.  Tr. 285.  There were no localizing findings on neurological exam.  Tr. 285.  Ms. Towers prescribed Inderal for migraines and advised Kaminski to follow up with her neurologist.  Tr. 285.  Kaminski saw Ms. Towers again on May 28, 2013, with complaints of migraines and anxiety.  Tr. 286  She was having a hard time sleeping.  Tr. 286.  Kaminski reported nausea with her migraines. Tr. 286.  She had not followed up with her neurologist and had not had imaging tests performed.  Tr. 286.  She requested a new order for imagining.  Tr. 286.  Ms. Towers advised Kaminski to take her medication as prescribed by Dr. Kushnar.[4]  Tr. 286.

In August 2013, Kaminski saw Ms. Towers with complaints of sinus congestion with pain around her eyes and she felt like her head was going to explode.  Tr. 287.  In September 2013, Kaminski saw Dr. Kushnar with reports of having migraines 18 days out of every month.  Tr. 288.  She reported having a horrible migraine that day.  Tr. 288.  It had started the day before and Kaminski had been throwing up all day.  Tr. 288.  Kaminski relayed that her neurologist wanted to have an MRI done but insurance would not cover it.  Tr. 288.  Kaminski felt that her stress and anxiety were causing her to have more headaches.  Tr. 288.  Another doctor had

---

[4] Dr. Diane Kushnar, D.O., was also with Ridgepark Family Practice, Inc., and signed off on Kaminski's office visits with Ms. Towers.  Tr. 285-286.

5

recommended that Kaminski try Vyvanse for her anxiety.  Tr. 288.  Kaminski did not think that her current dose of Inderal was adequate.  Tr. 288.  Dr. Kushnar advised that Kaminski should continue to see the specialists and follow up with her in one month.  Tr. 288.  Kaminski saw Dr. Kushnar on October 8, 2013, for medication management.  Tr. 289.   She needed a refill of Vyvanse which Kaminski felt was working well but thought should be increased.  Tr. 289.  Kaminski complained of excessive sweating but reported that she was able to focus and felt more productive and energetic and she was able to function well into the evening.  Tr. 289.  Dr. Kushnar agreed to increase the Vyvanse, with instructions to follow up in four weeks.  Tr. 289.

**C.**     **Plaintiff's testimonial and function report evidence**

     **1.  Administrative hearing testimony**

Kaminski testified and was represented at the January 13, 2014, hearing.  Tr. 31-41.  Kaminski stopped working as a nanny in 2009 because she was having a lot of pain due to her endometriosis and migraines and was unreliable because she was frequently calling off of work.  Tr. 32-33.

In describing her migraines, Kaminski explained that her migraines are excruciating; she feels like her head is going to explode; and sometimes her vision is impaired and/or the slightest noise or light is intolerable.  Tr. 33.  A typical migraine lasts at least 24 hours but Kaminski has had a migraine last as long as 5 days.  Tr. 33-34.  When Kaminski has a migraine, she uses an ice pack on her head and eyes and lies in the dark.  Tr. 34.  Kaminski is unaware of any specific triggers but sometimes she is able to tell that a migraine is coming on.  Tr. 34.  For example, there are times that her left eye will start twitching and her vision will get a little weird and about 15 minutes later her head will start throbbing.  Tr. 34.  Kaminski estimated having a migraine 15

6

to 18 times each month.  Tr. 34.  Kaminski's doctors have tried different medications for her migraines but nothing has really helped.  Tr. 35.

Kaminski also described her abdominal pain, explaining that it feels like ripping or tearing inside and she experiences the pain about 3 weeks each month.  Tr. 35.  The only thing she can really do for the pain is curl up in a ball with a pillow pushed up against her stomach.  Tr. 35.  To address the problem, Kaminski had undergone laparoscopic surgeries to remove the endometriosis but her doctors have told her she will continue to need surgeries because the endometriosis reforms and reattaches to other areas.  Tr. 35.  Her last surgery was in April 2013.  Tr. 36.  She felt better for about two months but then the pain started again.  Tr. 36.

Kaminski also explained that, starting about a year ago, she started having anxiety attacks.  Tr. 36.  During an anxiety attack, she feels shaky, like she is going to jump out of her skin, and her heart races.  Tr. 36.  Her sleep is affected by the pain from her migraines and endometriosis and, when she is unable to sleep, it causes anxiety.  Tr. 37.  Kaminski's primary care physician was prescribing medication for Kaminski's anxiety.  Tr. 37.  She was looking for a psychiatrist or psychologist at the time of the hearing.  Tr. 37.  The medication helped with her anxiety.  Tr. 37.

Kaminski had problems with an opioid addiction that stemmed from taking more pain medication that she should have in an effort to manage her pain.  Tr. 38.  She realized that she was having a problem and sought help.  Tr. 38-39.  Her doctor has prescribed Suboxone to help her with the withdrawal from the narcotic pain medication.  Tr. 39.  The Suboxone helps with the withdrawal issues and helps a little with her back pain but it does not really help with her migraines or endometriosis.  Tr. 39.  Kaminski had been sober for over a year.  Tr. 39.

Kaminski lives with her mother and 2 year old daughter and her mother helps take care of her daughter. Tr. 40-41. When Kaminski is having a migraine she can take care of her daughter to some extent but, if her migraine is so bad that she cannot handle noise or anything, her mother will take care of her daughter. Tr. 40-41. Also, Kaminski's sister and aunt help out. Tr. 40.

### 2. Function Report - Adult

On April 23, 2012, Kaminski completed a Function Report – Adult ("Function Report"). Tr. 187-194. In the Function Report, Kaminski indicated that she had had migraines since she was 10 years old and she was experiencing migraines at least 15 to 18 days out of a month. Tr. 187. She also indicated that she suffers from severe endometriosis. Tr. 187. She stated she has tried everything for both conditions but without success. Tr. 187. Kaminski reported that her baby keeps her moving but, before having the baby, she wanted to sleep and lie down all the time. Tr. 188. She indicated that her pain is unbearable and she sleeps when her baby does. Tr. 188.

Kaminski reported taking care of her baby's daily needs and activities. Tr. 188. Kaminski's mother and other family member help her take care of her baby. Tr. 188. Because of her pain, Kaminski has problems falling asleep and staying asleep. Tr. 188. She reported having no problems taking care of her personal needs. Tr. 188. Kaminski can prepare simple meals, i.e., frozen dinners and sandwiches, which she does at least twice a day. Tr. 189. She lacks the energy and strength or is in too much pain to cook full meals. Tr. 189. Kaminski reported doing household chores such as laundry and cleaning but indicated she does so very slowly and a little at a time. Tr. 189. Kaminski goes out every few days. Tr. 190. She drives and is able to go out alone. Tr. 190. She shops about once a month for groceries, things for the baby, and clothes. Tr. 190.

As far as hobbies and interests, Kaminski reported enjoying watching television, playing cards and taking walks. Tr. 191. She reported not being able to go on walks as often as she would like and indicated that she often watches television because it seems like it is the only thing she can do. Tr. 191. Two or three times each month, Kaminski spends time with others to have conversation, watch movies, share meals or play cards. Tr. 191.

Kaminski indicated that her conditions affect her ability to lift, squat, bend, reach, walk, kneel, remember, complete tasks, concentrate and follow instructions. Tr. 192. She can walk about 50 feet before needing to stop and rest for 10 minutes. Tr. 192. She can pay attention for only a few minutes and has a hard time following instructions. Tr. 192. She has to read instructions several times and has a hard time remembering things she has read. Tr. 192. She reported her ability to handle stress was "fair" and her ability to handle changes in routine was "good." Tr. 193. As far as any unusual behaviors or fears, Kaminski reported that she has anxiety. Tr. 193.

D.   **Vocational expert's testimony**

Vocational Expert Gene Burkhammer ("VE") testified at the hearing. Tr. 41-46. Before proceeding with questions, the ALJ indicated he was making a finding that there was no past relevant work because, although Kaminski had worked, it did not rise to the level of substantial gainful activity. Tr. 42.

For his hypothetical question, the ALJ asked the VE to assume an individual 29 years of age, with a limited 11th grade education and no currently relevant vocational training who would be limited to light work, meaning that the individual could sit, stand or walk for 6 hours each during an 8-hour workday and could lift, carry, push or pull 10 pounds frequently and 20 pounds occasionally, all with commercially normal breaks. Tr. 43. Also, the hypothetical individual

9

would be precluded from using ladders, ropes and scaffolds; precluded from all exposure to workplace hazards such as unprotected heights and unprotected moving machinery and precluded from occupational driving. Tr. 43. Also, the hypothetical worker would be limited to low stress tasks, meaning precluded from tasks in fast paced production environments and precluded from tasks that require arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others. Tr. 43. The VE indicated that there would be light level jobs available to the described individual, including (1) housekeeping cleaner; (2) sales attendant; and (3) mail clerk.[5] Tr. 44-45.

In response to Kaminski's counsel's questioning, the VE indicated that there would be no jobs available to a hypothetical worker who would be absent from work two or more days per month. Tr. 46.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

---

[5] The VE provided job incidence data for the three jobs identified. Tr. 44-45.

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[6] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy. *Id.*

---

[6] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

## IV. The ALJ's Decision

In his February 28, 2014, decision, the ALJ made the following findings:[7]

1. Kaminski met the insured status requirements through June 30, 2006. Tr. 12.

2. Kaminski had not engaged in substantial gainful activity since September 6, 2003, the alleged onset date. Tr. 12.

3. There were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment through Kaminski's date last insured of June 30, 2006.[8] Tr. 12-13.

4. Kaminski had the following severe impairments: migraines, anxiety, attention deficit hyperactivity disorder, and a substance addiction disorder (opiates). Tr. 13.

5. Kaminski did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 14-15.

6. Kaminski had the RFC to do a range of light work. She could lift, carry, push and/or pull 10 pounds frequently and 20 pounds occasionally and could sit, stand and/or walk for 6 hours each in an 8-hour day with normal breaks. She could never use ladders, ropes and scaffolds. She was precluded from all exposure to workplace hazards (such as unprotected moving machinery and unprotected heights) and was precluded from occupational driving. She was limited to low stress tasks so she was precluded from tasks done in fast paced production environments; precluded from tasks that require arbitration, confrontation, negotiation, directing the work of others, or being responsible for the safety of others. Tr. 15-18.

7. Kaminski had no past relevant work. Tr. 18.

8. Kaminski was born in 1984 and was 19 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. She was 27 on December 20, 2011, and 29 at the time of the decision. Tr. 18.

---

[7] The ALJ's findings are summarized.

[8] This finding pertains to Plaintiff's Title II (DIB) claim. Tr. 13. As indicated above, Plaintiff is not challenging the denial of DIB benefits.

12

9. Kaminski had a limited 11th grade education and was able to communicate in English. Tr. 18.

10. Transferability of job skills was not an issue because Kaminski had no past relevant work. Tr. 18.

11. Considering Kaminski's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Kaminski could perform, including housekeeping cleaner, mail clerk, and sales attendant. Tr. 18-19.

Based on the foregoing, the ALJ determined that Kaminski had not been under a disability from September 6, 2003, through the date of the decision. Tr. 19.

### V. Parties' Arguments

Kaminski's sole argument is that the ALJ's finding that her allegations regarding the limitations caused by her migraine headaches were not entirely credible was not supported by substantial evidence. Doc. 13, pp. 8-10. In response, the Commissioner argues that in evaluating Kaminski's migraine headaches the ALJ considered relevant evidence, including treatment records, opinion evidence, and Kaminski's statements, and properly and reasonably assessed Kaminski's credibility. Doc. 15, pp. 7-11.

### VI. Law & Analysis

**A.    Standard of review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

(6th Cir. 1989). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.    The ALJ properly assessed Kaminski's credibility**

Kaminski contends that the ALJ's reasons for finding her allegations regarding the limitations associated with her migraines not credible were not supported by substantial evidence. Doc. 13, pp. 8-10.

Social Security Ruling 96–7p and 20 C.F.R. § 404.1529 describe a two-part process for assessing the credibility of an individual's subjective statements about his or her symptoms. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.

When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the

location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); Soc. Sec. Rul. 96–7p, *Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at 3 (July 2, 1996) ("SSR 96-7p"). "An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

Consistent with the regulations, the ALJ considered Kaminski's allegation that her migraines were so debilitating so as to preclude all work but concluded that Kaminski's allegations were not entirely credible. Tr. 15-18. In reaching his decision, the ALJ considered, among other evidence, treatment records and medical opinion evidence. Tr. 15-18. For example, in reaching his decision, the ALJ considered the opinions of Dr. Misja and Dr. McKee.[9] Tr. 17. Kaminski does not contend that the ALJ improperly weighed the medical opinion evidence or that the medical opinion evidence does not support the ALJ's decision.

The ALJ also considered Kaminski's daily activities, such as performing household chores, taking care of her child, taking walks, visiting with her sister, shopping, playing cards and watching movies. Tr. 14, 16. Kaminski contends that the ALJ's reliance on Kaminski's

---

[9] The ALJ provided some weight to both opinions but included greater restrictions than those included in Drs. McKee and Misja's opinions. Tr. 17.

performance of certain activities to find her allegations not entirely credible was faulty because the evidence shows that, because of her migraines, she was unable to perform these activities on a sustained basis. Doc. 13, p. 9. As an example, Kaminski argues that, when she is having a migraine, her mother or other family members have to help her care for her daughter. Doc. 13, p. 9. However, Kaminski has not shown that the ALJ ignored evidence that Kaminski alleged to have up to 18 migraines per month. Tr. 17. Nor has Kaminski shown that the ALJ ignored evidence that she received assistance from family or shared household chores with her mother. Tr. 14, 17. Furthermore, even if Kaminski required assistance from her family at times, Kaminski has not shown that the ALJ was precluded from considering evidence of her activities as a factor in assessing the credibility of her allegations. *See* 20 C.F.R. § 404.1529(c)(3)(i); *see also Walters*, 127 F.3d at 532 (a claimant's activities may be considered by an ALJ when assessing a claimant's assertions of pain).

The ALJ also considered Kaminski's positive response to medication, which demonstrated that, with medication, Kaminski had the ability to manage her activities of daily living, i.e., in October 2013, Kaminski reported feeling more energetic and able to function well into the evening. Tr. 17, 289. Kaminski contends that the ALJ's reliance on one treatment note reflecting a positive response to medication was error because her testimony at the hearing, which was subsequent to the October 2013, office visit, revealed that she was still continuing to have migraines. Doc. 13, p. 9. However, the ALJ's consideration of Kaminski's response to medication when assessing the credibility of her allegations was proper under the Regulations. *See* 20 C.F.R. § 404.1259(c)(3)(iv).

Kaminski has not shown that that ALJ ignored evidence or failed to explain his credibility assessment. Nor has she identified medical opinion evidence to support limitations

16

beyond those contained in the RFC to account for her migraines. Rather, Kaminski's argument amounts to a request that the Court reweigh evidence considered by the ALJ and/or assess her credibility de novo. However, it is not for this Court to "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987). Kaminski disagrees with the ALJ's credibility assessment and challenges the ALJ's evaluation of the evidence but she has not demonstrated that the ALJ's credibility assessment is not supported by substantial evidence. *See Jones*, 336 F.3d at 476 (In reviewing an ALJ's credibility determination, a court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record.").

Having reviewed the ALJ's decision, and considering that an ALJ's credibility assessment is to be accorded great weight and deference, the undersigned finds that the ALJ's credibility analysis is sufficiently explained and is supported by substantial evidence. Accordingly, the undersigned recommends that the Court reject Kaminski's request to reverse and remand the Commissioner's decision on the basis of the ALJ's credibility assessment.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

May 2, 2016

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).